THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANTONIO D. KIDD, Defendant-Appellant.

Fourth District    No. 4—95—0523

Opinion filed March 20, 1998.

STEIGMANN, J., specially concurring.

Daniel D. Yuhas and Michele A. Knapp, both of State Appellate Defender's Office, of Springfield, for appellant.

Patrick W. Kelley, State's Attorney, of Springfield (Norbert J. Goetten, Robert J. Biderman, and Kathy Shepard, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE COOK delivered the opinion of the court:

After a jury trial, defendant was found guilty of first degree murder (felony murder) and the aggravated battery of Anthony Lipsey. 720 ILCS 5/9—1(a)(3), 12—4(a) (West 1994). On appeal, defendant argues (1) the trial court erred in refusing his proposed jury instructions for second degree murder, and (2) his sentence of imprisonment should be credited with one additional day.

On October 6, 1994, Anthony Lipsey (the victim) and Edwin Jones were walking down the street together when a man farther down the street yelled "hey" at them. The man signaled to a porch full of men to join him. Lipsey and Jones were then surrounded by additional people who came from a nearby alley. A white car pulled up near them and four or five people from the car joined the crowd, including the defendant, Antonio Kidd, and Donnie Brown. Defendant asserts he "wasn't thinking of nothing" when he walked up to where Lipsey and Jones were standing. Jones backed away from the crowd and stood across the street. An argument ensued between Lipsey and the man who had yelled "hey," and the man hit Lipsey in the face.

A fight then broke out between Lipsey and several members of the group, lasting approximately 5 to 10 minutes. There is some dispute about who initiated the fight. Defendant and Brown contend that Lipsey struck defendant on the side of the head with his hand, while holding a can, causing defendant to stagger backward. Jones, however, maintains that Lipsey did not strike anyone before he was

struck and that Lipsey threw punches only in an attempt to defend himself. Jones did not see Lipsey holding anything in his hands.

After Lipsey allegedly hit defendant, Brown and another man grabbed Lipsey as he tried to run away and pulled him back into the fight. Brown and the other man hit Lipsey until defendant hit Lipsey "no more than three" times—twice in the face and "probably" in the chest area. Defendant estimates 30 to 60 seconds elapsed between the time Lipsey struck defendant and defendant hit Lipsey. During that time defendant decided it was "time *** to get [his] licks in." Defendant admitted that at the time he hit Lipsey, Lipsey did not put him in fear of his safety, since Lipsey was being beaten by the other two men.

After the fight, all the men left the area. Jones went over to Lipsey, helped him up, and walked him home. Lipsey reported the incident to the police. Officer John Kohler of the Springfield police department was on duty on October 6, 1994, when Lipsey flagged him down. Lipsey told Kohler that he had just been beaten up by four black males, who had also robbed him about one week earlier. Lipsey explained that they beat him up because they did not want him to press charges against them for the prior robbery. Lipsey identified one of the men as defendant Kidd. At trial, Edwin Jones testified that the people who beat Lipsey were talking about someone taking money from Lipsey. Cortessa Williams testified that on October 5, 1994, one day before the fight, she heard a conversation between Sylvester Anderson and defendant Kidd regarding someone they wanted to get even with. Kidd stated that he had to get "him" for telling the police on them, but did not name anyone in particular.

Lipsey remained at home the evening of October 6. Lipsey's mother and father, Betty and Joe, noticed bruises and swelling around his right eye, lip, and his right temporal area. Lipsey refused suggestions by his parents to go to the hospital. Betty checked on him periodically throughout the night. When she checked around 6:15 a.m. on October 7, she noticed white liquid coming from his mouth, and his difficulty in breathing. Lipsey did not respond when Joe shook him, and he eventually stopped breathing. An ambulance took Lipsey to the hospital, where efforts to resuscitate him were unsuccessful.

On November 18, 1994, the State issued a two-count indictment against Antonio Kidd. In count I, the State charged defendant with first degree murder (felony murder), in that "while committing a forcible felony, Aggravated Battery, *** [defendant] struck Anthony Lipsey in the head with his hand and thereby caused the death of Anthony Lipsey." 720 ILCS 5/9—1(a)(3) (West 1994). Count II

charged defendant with aggravated battery in that he "intentionally caused great bodily harm to Anthony Lipsey in that he struck Anthony Lipsey in the head with his fist." 720 ILCS 5/12—4(a) (West 1994). Defendant was tried by a jury, along with codefendant Donnie Brown.

During the jury trial, defendant testified that when he hit Lipsey on October 6, 1994, he did not believe his punches could have killed or caused great bodily harm to Lipsey. During the fight, he had no idea that Lipsey would die. Dr. Victor Lary performed Anthony Lipsey's autopsy on October 7, 1994, and concluded that the cause of Lipsey's death was a traumatic head injury resulting in an epidural hematoma, a large and relatively recent clot of blood located between the skull and the brain pressing downward on the brain. Dr. Lary could not determine how much force created Lipsey's head injury, but said that blows to the head with a fist could cause an epidural hematoma.

During the jury instructions conference, defendant's attorney tendered instructions for second degree murder based on provocation. The trial court refused to give the second degree murder instructions, apparently finding the evidence insufficient to allow those instructions to be given and concluding that the case only raised the issue of whether defendant committed aggravated battery, the predicate offense for the felony murder charge. The jury subsequently found defendant guilty of first degree murder (felony murder) and aggravated battery. 720 ILCS 5/9—1a)(3), 12—4(a) (West 1994). The trial court sentenced defendant to 25 years' imprisonment and awarded him credit for 228 days served.

Defendant filed a posttrial motion arguing the trial court erred in not instructing the jury on second degree murder. Defendant argued those instructions should have been given because the evidence showed defendant had no felonious intent prior to being struck in the head by Lipsey. In addition, because Lipsey struck defendant first, Lipsey was the initial aggressor, which caused the defendant to act under a sudden and intense passion resulting from serious provocation by Lipsey. The court denied defendant's posttrial motion. This appeal followed.

Prior to 1987, Illinois defined voluntary manslaughter to include the situation where the defendant "is acting under a sudden and intense passion resulting from serious provocation." Ill. Rev. Stat. 1985, ch. 38, par. 9—2(a). Since 1987, provocation has been addressed by the second degree murder statute, which made significant changes in that defense. 720 ILCS 5/9—2(a) (West 1994).

Defendant recognizes that in most felony murder cases it should

not be a defense that a defendant is provoked, but he argues the defense is available in this case, citing *People v. Williams*, 164 Ill. App. 3d 99, 109, 517 N.E.2d 745, 751 (1987). A person who intends to rob a shopkeeper or rape an individual is not allowed to claim that he was provoked by his victim or to raise any other affirmative defense if, in the course of committing the original felony, the intended victim or any other person is killed. *Williams*, 164 Ill. App. 3d at 109, 517 N.E.2d at 751. The argument that a defendant was provoked to commit the robbery or rape in which the victim was killed similarly has no merit. Mental state is irrelevant. "It is immaterial whether the killing in such case is intentional or accidental, or is committed by a confederate without the connivance of the defendant." Ill. Ann. Stat. ch. 38, par. 9—1, Committee Comments—1961, at 16 (Smith-Hurd 1979). *Williams* held, however, that in the unusual fact situation before it the provocation defense should have been available.

In *People v. Viser*, 62 Ill. 2d 568, 343 N.E.2d 903 (1975), the court considered whether felony murder could be charged when the predicate felony was the aggravated battery that resulted in the victim's death. In *Viser*, a chance dispute between two groups of people who did not know each other resulted in the aggravated battery of two victims, one of whom died a few days later. The supreme court recognized that other states had held that an assault upon the person killed could not be made the basis of a felony murder charge. *Viser*, 62 Ill. 2d at 579, 343 N.E.2d at 909. The court was troubled, however, that in the case before it the argument was only a technical one: if the indictment had charged that the deceased victim had been killed during the commission of an aggravated battery on the surviving victim, the indictment would have been proper. *Viser*, 62 Ill. 2d at 578, 343 N.E.2d at 908.

The supreme court noted that most felony murders involve an aggravated battery or an assault, and it declined to rule out felony murder prosecutions in such cases simply because of the absence of an intention to commit another felony, especially in light of the legislature's "forthright characterization of aggravated battery as one of the forcible felonies that will trigger a charge of felony murder." *Viser*, 62 Ill. 2d at 579-80, 343 N.E.2d at 909; see 720 ILCS 5/2—8 (West 1994) (definition of "forcible felony"). If a person chooses to engage in dangerous conduct from which death is likely to result (and forcible felonies constitute such conduct), that person should be liable for felony murder whether the dangerous conduct consists of robbery, criminal sexual assault, or aggravated battery resulting in great bodily harm.

There are reasons why a prosecutor, seeking a first degree mur-

der conviction, might choose to charge felony murder under section 9—1(a)(3), even when a charge of intentional or knowing murder is possible under section 9—1(a)(1) or (a)(2). First, the prosecutor will not have to show that there was any intent to kill when the charge is felony murder. Second, the provocation defense may not be available when the charge is felony murder. *Viser* clearly held the first proposition to be the law. "What was intended was to deter the commission of any of the enumerated forcible felonies, including aggravated battery, by holding the perpetrator responsible for murder if death results." *Viser*, 62 Ill. 2d at 580, 343 N.E.2d at 909. *Viser* did not hold the second proposition to be law. An instruction on the provocation defense was given in *Viser*, and the supreme court held that it would have been error to have refused that instruction. *Viser*, 62 Ill. 2d at 583, 343 N.E.2d at 911. There were also charges of intentional and knowing murder in *Viser*, for which the instruction clearly would have been appropriate, but it appears the jury returned a guilty verdict on only the felony murder count.

■ It is not the law that a prosecutor may avoid the provocation defense in an intentional or knowing murder case by charging felony murder based upon an aggravated battery upon the person killed. The procedure to be followed in that situation was addressed in *Williams*, where the court concluded there should be an instruction on the defense, even though provocation is not a defense to aggravated battery and is not usually a defense to felony murder. *Williams* would not allow the defense where the provocation occurred during the commission of the forcible felony, as where a shopkeeper resisted a robber. *Williams*, 164 Ill. App. 3d at 109, 517 N.E.2d at 751. However, where provocation occurs prior to the time that a defendant forms a felonious intent or commits an aggravated battery, defendant is entitled to the defense. *Williams*, 164 Ill. App. 3d at 110, 517 N.E.2d at 752. Otherwise prosecutors could avoid the defense in every case of first degree murder, even in cases that are clearly intentional or knowing murder cases.

The State argues that, in 1987, when the legislature adopted the second degree murder statute, it specifically provided that the defense of provocation applied only to intentional or knowing murder and could never apply to felony murder. See 720 ILCS 5/9—2(a) (West 1994) ("A person commits the offense of second degree murder when he commits the offense of first degree murder as defined in paragraphs (1) or (2) of subsection (a) of Section 9—1 ***"). The State did not make that argument in the trial court. That argument would effectively eliminate the second degree murder statute in intentional or knowing murder cases. If the prosecutor has the evidence to defeat a

claim of provocation, he may charge knowing or intentional murder. If he does not have that evidence, he may prevent the claim from being raised by charging felony murder, based on aggravated battery. See *Viser*, 62 Ill. 2d at 578-79, 343 N.E.2d at 908-09.

■ Did the legislature really intend an illusory second degree murder statute, one that exists at the choice of the prosecutor and will be applied only in cases in which it could be of no benefit to the defendant? We should avoid a construction of a statute that renders any part of it meaningless. The courts presume that the General Assembly, in passing legislation, did not intend absurdity, inconvenience or injustice, and a statute will be interpreted so as to avoid a construction that would raise doubts as to its validity. *Harris v. Manor Healthcare Corp.*, 111 Ill. 2d 350, 363, 489 N.E.2d 1374, 1379 (1986). A court should avoid an interpretation under which a statute is "explained away, or rendered insignificant, meaningless, inoperative, or nugatory." *Pliakos v. Illinois Liquor Control Comm'n*, 11 Ill. 2d 456, 460, 143 N.E.2d 47, 49 (1957). In order to give some meaning to the second degree murder statute, there must be some limit on a prosecutor's ability to charge felony murder in cases such as this. We need not consider what that limit should be, however, as we may decide this case on the issue addressed in the trial court, whether defendant presented sufficient evidence to warrant the giving of the provocation instruction.

It does not appear that the prosecutor in this case charged felony murder when the proper charge was intentional or knowing murder. Defendant did not use any weapon and may have hit Lipsey only two or three times with his fists, and Lipsey walked away from the altercation. Lipsey did not believe his injuries were so serious as to require medical attention. Perhaps defendant did not "intend[ ] to kill or do great bodily harm to" Lipsey or "know[ ] that such acts will cause death" or "know[ ] that such acts create a strong probability of death or great bodily harm." 720 ILCS 5/9—1(a)(1), (a)(2) (West 1994). It may be that if the State had made the argument in the trial court that it makes now, the trial court could have refused the provocation instruction on that basis. The State did not do so, however, and the question before us is whether defendant presented sufficient evidence to warrant the instruction.

■ A person commits second degree murder when "[a]t the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed." 720 ILCS 5/9—2(a)(1) (West 1994). The Criminal Code of 1961 defines "serious provocation"

as "conduct sufficient to excite an intense passion in a reasonable person." 720 ILCS 5/9—2(b) (West 1994). The defendant must be acting under a sudden and intense passion spurred from serious provocation that the law recognizes as reasonable. *People v. Garcia*, 165 Ill. 2d 409, 429, 651 N.E.2d 100, 110 (1995). Illinois courts recognize four categories of provocation: (1) substantial physical injury or substantial physical assault, (2) mutual quarrel or combat, (3) illegal arrest, and (4) adultery with the offender's spouse. *Garcia*, 165 Ill. 2d at 429, 651 N.E.2d at 110. Mutual quarrel or combat is a "fight or struggle which both parties enter willingly or where two persons, upon a sudden quarrel and in hot blood, mutually fight upon equal terms and where death results from the combat." *People v. Austin*, 133 Ill. 2d 118, 125, 549 N.E.2d 331, 334 (1989).

■ Whether to issue a specific jury instruction is within the province of the trial court, and such a decision will not be reversed unless it is an abuse of discretion. *Garcia*, 165 Ill. 2d at 432, 651 N.E.2d at 111; *Austin*, 133 Ill. 2d at 124-25, 549 N.E.2d at 333-34. If there is evidence that if believed by the jury would reduce a crime from first degree murder to second degree murder, defendant's requested second degree murder instruction must be granted. However, the defendant has the burden of proving that at least "some evidence" of serious provocation exists, otherwise the trial court may deny giving the instruction. *Austin*, 133 Ill. 2d at 125, 549 N.E.2d at 334.

■ We hold the trial court did not abuse its discretion in refusing to give defendant's second degree murder provocation instruction because defendant did not present sufficient evidence to warrant giving that instruction. No real evidence exists that shows defendant was acting under a sudden and intense passion resulting from serious provocation at the time he beat Lipsey.

Defendant argues that when he beat Lipsey he acted under a sudden and intense passion from serious provocation, but he does not specify under which of the four recognized categories of provocation the situation falls. It appears the only possible applicable category would be mutual quarrel or combat. However, we hold that this situation did not constitute mutual combat; consequently, defendant was not entitled to present the second degree murder instructions to the jury.

Defendant did not satisfy the mutual combat or quarrel standard as he presented no evidence indicating Lipsey willingly entered into the struggle or that the fight was on equal terms. Clearly this was not a one-on-one situation as Lipsey was initially surrounded by approximately 16 men. Furthermore, there is evidence that indicates defendant and the others may have planned this incident in response

to Lipsey reporting them to the police for previously robbing him and to prevent him from pressing charges against them. Even if Lipsey struck defendant in the head, this was not serious provocation, as Lipsey was probably trying to break free from the crowd, not instigate an altercation. Lipsey did try and escape the crowd once, but he was pulled back by two of the men. It was during the time these two men were beating Lipsey that defendant decided it was "time to get [his] licks in."

■ Defendant also contends that his sentence of imprisonment must be credited with one additional day as he served 229 days in the Sangamon County jail and the trial court only credited his sentence with 228 days. The State agrees that defendant is entitled to 229 days of credit. The Unified Code of Corrections provides that a defendant shall be given credit on his sentence for time he spent in custody. 730 ILCS 5/5—8—7(b) (West 1994); *People v. Donnelly*, 226 Ill. App. 3d 771, 779, 589 N.E.2d 975, 980 (1992). Defendant was in custody from November 6, 1994, through June 22, 1995, a total of 229 days, and is entitled to 229 days of credit on his sentence.

For the foregoing reasons, the judgment of the circuit court of Sangamon County is affirmed as modified and remanded for issuance of an amended judgment of sentence reflecting defendant's entitlement to 229 days' credit on his sentence.

Affirmed as modified and remanded with directions.

McCULLOUGH, J., concurs.

JUSTICE STEIGMANN, specially concurring:

In 1986, the legislature enacted Public Act 84—1450 (Pub. Act 84—1450, eff. July 1, 1987 (1986 Ill. Laws 4222)), which renamed the offense of murder to first degree murder, abolished the offense of voluntary manslaughter, and replaced it with second degree murder. As the supreme court explained in *People v. Jeffries*, 164 Ill. 2d 104, 111, 646 N.E.2d 587, 590 (1995), "[t]he intent of the legislature in enacting Public Act 84—1450 was to remedy the confusion and inconsistency that had developed in regard to the murder and voluntary manslaughter statutes." Part of that confusion and inconsistency dealt with the relationship of voluntary manslaughter to murder when a defendant was charged under the felony murder provision of the former murder statute.

In *Williams*, this court struggled with that relationship, noting that in most instances in which a defendant is charged with murder under the former statute, "the reduction in culpability [that is, a

reduction to a voluntary manslaughter conviction] due to passion should not be available as a partial defense to a felony murder charge." *Williams*, 164 Ill. App. 3d at 108, 517 N.E.2d at 751. However, the court then noted that "under the unusual fact situation presented by defendant's testimony in the instant case, the jury should have been given the provocation-voluntary manslaughter instruction in conjunction with the felony murder charge." *Williams*, 164 Ill. App. 3d at 108, 517 N.E.2d at 751. In support, the *Williams* court cited *Viser*, in which—according to the *Williams* court—the supreme court stated that it would have been error for the trial court to refuse to give a voluntary manslaughter instruction in a case involving a charge of felony murder.

However, *Williams* provides no support for the majority's holding here because (1) the legislature changed the voluntary manslaughter statute upon which *Williams* is based when it created the offense of second degree murder; and (2) part of the reason the legislature did so was *specifically* to reject the position the majority now adopts. In other words, as *Viser* and *Williams* demonstrate, confusion existed under the "old law" regarding whether a voluntary manslaughter conviction *could* result when the defendant was charged only with felony murder. Note that in defining voluntary manslaughter, section 9—2(a) of the Criminal Code of 1961 (Code) stated simply that "[a] person who kills an individual without lawful justification commits voluntary manslaughter" if at the time of the killing, he acted under serious provocation or an imperfect self-defense. Ill. Rev. Stat. 1985, ch. 38, par. 9—2(a). On the other hand, second degree murder as now defined in section 9—2(a) of the Code provides, in relevant part, that a person commits that offense *"when he commits the offense of first degree murder as defined in paragraphs (1) or (2) of subsection (a) of Section 9—1 of this Code"* and either mitigating factor is present. (Emphasis added.) 720 ILCS 5/9—2(a) (West 1994).

First degree murder can be committed in either of the following separate and distinct ways: (1) "knowing or intentional" murder (sections 9—1(a)(1) and (a)(2) of the Code), or (2) felony murder (section 9—1(a)(3) of the Code). By specifically referring to subsections 9—1(a)(1) and (a)(2) of the Code in defining second degree murder, the legislature made clear that second degree murder can be committed *only* when a defendant commits "knowing or intentional" murder. This is no oversight. If the legislature had intended to include felony murder as a possible basis (when either section 9—2(a) mitigating factor is present) for second degree murder, all it needed to say in defining second degree murder is that a person commits that offense when he commits the offense of first degree murder and either of the

mitigating factors is present—the same language, in other words, that the legislature had used to describe (under the "old law") when a charge of murder could serve as a possible basis for voluntary manslaughter.

Other than to change the name of the offense, Public Act 84—1450 left section 9—1 of the Code (defining murder) the same in all particulars. Under Public Act 84—1450, the primary change to section 9—2 of the Code (besides the change of name) was to place the burden of proof on a defendant who asserts the presence of mitigating factors. (Note that the statutory definition of mitigating factors was not changed from the old section 9—2 to the new statute.) In fact, other than shifting the burden of proof, the *single biggest change* between voluntary manslaughter and second degree murder is the new definition of second degree murder which—*on its face*—omits the possibility that second degree murder can be based upon felony murder.

The question that the majority should address is this: other than the result I claim was intended when the legislature enacted the statute—namely, to achieve the specific result of ensuring that second degree murder could never be based upon felony murder—what possible explanation can the majority provide for this change in the language of section 9—2(a)?

Assuming, for the moment, that the legislature did not wish to permit felony murder to serve as a predicate for second degree murder, how could it possibly have made its views more clear? I suggest the only way it could have done so is by using a legislative device that it heretofore has never used—namely, by adding the following sentence to section 9—2 of the Code (perhaps as a new subsection (b)): "The omission of any reference to paragraph (3) of subsection (a) of section 9—1 of this Code within the definition of second degree murder was intentional to ensure that felony murder may not constitute the predicate for a second degree murder conviction."

Defining criminal offenses—and providing for mitigated homicides, if that is the legislature's wish—lies entirely within the legislature's province. It was not compelled to provide that the presence of mitigating factors would reduce a defendant's commission of first degree murder to second degree murder, a lesser mitigated offense. See *Jeffries*, 164 Ill. 2d at 122, 646 N.E.2d at 595. Nor, once the legislature decided to make *some* first degree murders (the "intentional or knowing" murders) capable of being mitigated into second degree murders, was it compelled to make *all* first degree murders (including felony murders) capable of being mitigated into second degree murders. (For a comprehensive discussion of the

changes in Illinois' murder statute and the policies underlying those changes, see D. Shanes, *Murder Plus Mitigation: The "Lesser Mitigated Offense" Arrives in Illinois,* 27 J. Marshall L. Rev. 61 (1993).)

The majority simply disapproves of how the legislature has chosen to define second degree murder and thinks it should be defined broadly enough so that second degree murder could result when a defendant is charged only with felony murder. The majority's holding is inconsistent with the words of the supreme court in *Jeffries,* when that court spoke of the deference due the legislature in enacting statutes—indeed, the very statutes at issue in this case:

> "[W]e recognize that the judicial role in construing statutes is to ascertain legislative intent and give it effect. To accomplish this goal, a court will seek to determine the objective the legislature sought to accomplish and the evils it desired to remedy." *Jeffries,* 164 Ill. 2d at 110, 646 N.E.2d at 590.

Regarding the *Pliakos* case—which holds that a court should avoid an interpretation under which a statute is explained away, or rendered insignificant, meaningless, inoperative, or nugatory—the essential point is that section 9—2 of the Code in defining second degree murder neither requires nor permits *an interpretation*; that statute is clear on its face in that it refers only to knowing and intentional murder under section 9—1(a)(1) or (a)(2) of the Code—not 9—1(a)(3), defining felony murder.

The majority's concern that, under my view, second degree murder would no longer exist is not supported by experience. Ten years have now passed since the enactment of the first and second degree murder statute, and there has been no shortage of juries either being instructed upon—or finding defendants guilty of—second degree murder.

The Code was enacted in 1961 (at which time the modern versions of murder and voluntary manslaughter were enacted), which means that 25 years passed before an appellate court (*Williams*) held that—under limited circumstances—voluntary manslaughter could be premised upon a felony murder count. And during the 10 years that have passed since *Williams* was decided, *not a single case* has similarly held that second degree murder can be based upon a felony murder count.